# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

## JULY 1998 SESSION



FILED

December 11, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | No. 02C01-9707-CR-00289 |
| | ) | |
| Appellee | ) | |
| | ) | Shelby County |
| vs. | ) | |
| | ) | Honorable John P. Colton, Jr., Judge |
| **CARLOS D. HAYWOOD,** | ) | |
| | ) | (Felony Murder, Attempted Especially |
| Appellant. | ) | Aggravated Robbery) |


FOR THE APPELLANT:

A. C. WHARTON, JR.
Shelby County Public Defender

BARRY KUHN
Assistant Public Defender
(At Trial)

WALTER GWINN
Assistant Public Defender
(On Appeal)
201 Poplar Ave., Suite 201
Memphis, TN 38103-1947

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General & Reporter

ELIZABETH T. RYAN
Assistant Attorney General
Criminal Justice Division
425 Fifth Ave. North
2d Floor, Cordell Hull Bldg.
Nashville, TN 37243-0493

WILLIAM L. GIBBONS
District Attorney General

PATIENCE R. BRANHAM
LEE V. COFFEE
Assistant District Attorneys General
201 Poplar Ave., Suite 301
Memphis, TN 38103-1947


OPINION FILED: _____


**CONVICTIONS AFFIRMED**, **SENTENCE MODIFIED.**


JAMES CURWOOD WITT, JR.
JUDGE

**OPINION**

The defendant, Carlos D. Haywood, was convicted in a jury trial in the Shelby County Criminal Court of felony murder and attempt to commit especially aggravated robbery. After a bifurcated trial in which the state sought a life sentence without the possibility of parole, the jury found that the aggravating circumstance did not outweigh the mitigating circumstances beyond a reasonable doubt and sentenced the defendant to life with the possibility of parole. The trial court sentenced the defendant to a consecutive sentence of twelve years as a Range I offender for attempted especially aggravated robbery, a class B felony. In this appeal, the defendant contends (1) that the evidence is legally insufficient to sustain his convictions, (2) that the trial court erred in admitting testimony about the defendant's gang affiliation, (3) that admission of five photographs of the victim's body taken during the autopsy were unfairly prejudicial, and (4) that his sentence is excessive. Our review of the record has uncovered no error requiring reversal of the defendant's convictions. We find, however, that the trial court incorrectly applied several enhancement factors to the defendant's sentence. Therefore, we affirm the judgment of the trial court but modify the defendant's sentence for attempted especially aggravated robbery.

## I. **Facts**

Sometime after midnight on Saturday, June 18, 1995, Barry Brodey was shot at close range with a shotgun in the parking lot of the Fantasy Warehouse in Memphis. Hospital personnel pronounced him dead at approximately 2:00 a.m. On the following Monday, Memphis police officers arrested fifteen-year old Carlos Haywood and two co-defendants for Brodey's murder.[1] The evidence at trial provides us with the following narrative of events.

---

[1] The indictment names as co-defendants Tyre S. Allen and Frederick D. Branch (also known as Frederick Lewis). The cases were severed for trial. Neither Allen nor Branch testified at Haywood's trial.

Barry Brodey, who lived in Indianapolis, Indiana, was attending a business-related conference in Memphis. On Friday evening, June 17, 1995, he had dinner with some friends. When he left them at about 11:30 p.m., he said he was headed back to the Peabody Hotel. Brodey never returned to the hotel.

At about 1:00 a.m., Trudy Blanchard, a shift manager at Fantasy Warehouse, heard what she thought were backfires in the parking lot. When she stepped out the front door, she saw someone firing a shotgun into the ground about four cars down from the door. She stepped back inside and asked the cashier to call 911. As she opened the door again, the shooter ran directly past her around the corner of the building. She described him as a young black man, possibly seventeen or eighteen years old, about five feet five inches in height with short, black hair. He was carrying a sawed off shotgun in his hands. She walked down the sidewalk to the place where the shots were fired and found Brodey lying face down on the pavement between two cars.

A few moments later, Sergeant Michael Williams turned into the parking lot. He was on routine patrol in the area and frequently checked the Fantasy Warehouse parking lot because it had recently been the scene of criminal activity. People in the lot flagged him down and told him there had been a shooting. They said that the shooter had run around the corner of the building. Williams then drove around the back of the building and tried to find the suspect. When he saw no one he returned to the scene where he found a bleeding white male lying on the pavement between two automobiles. The man's shoes were off. Several people were trying to stop the bleeding with a towel or blanket. Parked nearby was a black Cadillac. The driver's side door was standing open, the lights were on, and the engine was running. The back and rear side windows had been shot out. The sergeant found a handgun and a clip lying in the driver's seat. The victim, who was still alive, was taken by helicopter to a hospital where he died.

3

The next day, Capt. Mike Houston received a telephone call from Al Pritchard. Pritchard, who had been the defendant's friend for ten years, told Houston that the defendant fired the shots that killed Brodey. Pritchard and the defendant had been at the home of another friend before the shooting. Pritchard knew that the defendant was going "shopping" for some rims.[2] The defendant left carrying a sawed-off Mossberg pump-action shotgun. At 3:00 a.m., the defendant returned and told Pritchard that when he ordered the driver of a Cadillac to get out of the car, the driver refused and pulled a gun on him. The defendant then shot him. Pritchard advised the defendant to get rid of his blood-spattered T-shirt. Later, after reading in the newspaper that the driver died, Pritchard decided to call the police.[3] After speaking to Houston, Pritchard took the defendant to the parking lot where he retrieved the shotgun from where he had thrown it in some bushes.

As result of the information provided by Pritchard, Houston obtained a search warrant and officers ultimately found a sawed-off shotgun under a sofa at the defendant's grandmother's house. At this point, the police arrested the defendant and brought him and his grandmother, who was his legal guardian, to the station. His grandmother was present during the interview. She and the defendant signed and dated the advice of rights form. During the interview, the defendant confessed to shooting Brodey.

According to the statement, Haywood was asleep in bed when his two co-defendants came by and invited him to go "shopping" with them. Haywood was anxious to obtain a set of Vogue-STS rims because Tyre Allen had sold a set for $1500. The three had been riding around for a while when Tyre spotted the Cadillac with STS rims as it turned into the parking lot. They followed it in and stopped the car just beyond the Cadillac. The defendant jumped out carrying the

---

[2] "Shopping," apparently, is street slang for driving around looking for a vehicle with specific equipment that can be hijacked and then stripped.

[3] According to Pritchard, he thought "things were getting out of hand . . . People start getting killed."

4

shotgun, yanked open the driver's door and ordered the driver out. Brodey, however, did not comply. He began to fumble with something near the seat belt release. When the co-defendant honked the horn, the defendant glanced away. He turned back, cocked the weapon, and once again ordered Brodey from the vehicle. He told the victim, "Get out or I'll shoot you." The victim pulled up the handgun and said, "Not before I shoot you first." The defendant became frightened and shot the victim. He was afraid the victim would shoot him in the back if he tried to run away. He ran around the car and fired at Brodey through the windows because he thought the victim was still trying to shoot him. Then he ran around the building but the co-defendants were gone. He threw the shotgun in some shrubbery and continued to run. When he felt safe, he called Tyre from a pay phone, and Tyre came and picked him up.

The medical examiner testified that the victim died from internal bleeding caused by multiple pellet wounds to the chest, abdomen, and extremities. The pattern of wounds indicated that the victim had been shot at least three times from the front. The shots were fired from within a few feet. The victim sustained no wounds to his back. His system contained traces of alcohol and metabolite of cocaine.

The defendant testified in his own behalf. Although he added some details, his trial testimony was generally consistent with the statement he made to the police. According to his trial testimony, after the first shots were fired, the victim got out of the car with the handgun in his hand. The defendant ran behind the car and fired at him again. This shot hit the Cadillac's rear window. When the defendant moved to the passenger side of the car, the victim leaned over the hood of the car. The defendant fired two more shots that broke out the rear windows. He insisted that he never shot the victim when he was on the ground and that he had no intent to kill the man. He was afraid and wanted to get away. After firing the fifth shot, he fled. When he jumped into the drainage ditch that borders the parking lot,

he fell against some barbed wire which gashed his arm and caused him to bleed all over his T-shirt.

Based on this evidence, the jury found the defendant guilty of attempted especially aggravated robbery and felony murder.[4] The defendant now contends that the evidence is legally insufficient to sustain the convictions.

## II. Sufficiency of the Evidence

The standard for determining the sufficiency of the evidence on appeal is well-established. Since a jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, a convicted defendant has the burden of demonstrating on appeal that the evidence is insufficient. State v, Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In determining that sufficiency, this court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). It is the appellate court's duty to affirm the conviction if the evidence, viewed under these standards, was sufficient for any rational trier of fact to have found the essential elements of the offenses beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 317, 99 S.Ct. 2781, 2789 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); Tenn. R. App. P. 13(e).

Especially aggravated robbery is the intentional or knowing theft of property from the person of another accomplished with a deadly weapon and

---

[4]     The defendant was indicted for felony murder in count 1 and premeditated and deliberate murder in count 2 of indictment # 96-00973. According to the transcript, the jury returned a verdict of guilty in count 1 of #96-00973. The jury found the defendant guilty of an attempt to commit especially aggravated robbery in indictment #96-00974.  The jury did not return a verdict on the count charging a premeditated and deliberate murder. The record does not indicate whether the trial court dismissed this count.

resulting in serious bodily injury to the victim. Tenn. Code Ann. § 39-13-403 (1997).

Our legislature has defined criminal attempt as:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense
>
> * * *
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101 (1997).

The defendant admitted on the stand at trial that he intended to steal some tire rims and that he attempted to take Brodey's car from him at gunpoint. He then shot Brodey at least three times at close range. Brodey died as result of his injuries. The proof clearly established the elements of attempted especially aggravated robbery.

At the time of this offense, murder in the perpetration of a felony was "the reckless killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (1991).[5] The defendant's actions were, at a minimum, reckless. He pointed the loaded and cocked weapon at the victim and ordered him from his car. He fired the pump shotgun at the victim from close range, and then, by his own testimony, proceeded to fire at him at least four more times. Trudy Blanchard saw the defendant discharge the shotgun into what she believed was the ground. The defendant was surely aware of but disregarded the risk that the victim would be seriously injured or killed as the result of his actions. Tenn. Code Ann. § 39-11-106(a)(31)(1991). Disregarding this risk constituted a gross deviation from the

---

[5]      On July 1, 1995, a few weeks after the commission of this offense, the legislature amended the section to exclude the reckless mens rea. See Tenn. Code Ann. § 39-13-202(a)(2) (1997).

7

standard of care that an ordinary person would exercise in the circumstances. Id. The proof establishes the elements of felony murder beyond a reasonable doubt.

### III. Testimony of Defendant's Gang Affiliation

The defendant contends that the trial court erred by allowing testimony about the defendant's gang affiliation as well as about the presence of fellow gang members in the courtroom. We find that, under these circumstances, the testimony should have been excluded. The error, however, was harmless.

The record indicates that after a noon recess, the state's attorney questioned the witness, Al Pritchard, about some young men that Pritchard had noticed in the courtroom during his earlier testimony. At that point, defense counsel objected. At a jury-out hearing, the prosecutor stated that the defendant was a member of the "Gangster Disciples" and that when Pritchard left the stand for the noon recess, he told the prosecutor that gang members were in the courtroom to intimidate him. The state also informed the court that Pritchard and the defendant had an altercation in jail. The state contended that the evidence was relevant to show motive, premeditation, deliberation and to negate any claim of self-defense. The defense claimed that even if the evidence were relevant, its prejudicial effect far exceeded its probative value. The trial court, without making any specific findings, allowed Pritchard to testify that the defendant was a member of the Gangster Disciples and that members of the gang had been present in the courtroom.[6] Pritchard also testified that he and the defendant had fought when they were first incarcerated together and that just recently, the defendant had approached him and told him to tell the jury that he didn't remember anything.[7]

---

[6] The defendant complains about the trial court's failure to make specific findings. However, Rule 404 states that a trial court "must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence. . . ." Tenn. R. Evid. 404(b)(2) (emphasis added). In this case, the defense made no such request.

[7] Pritchard was arrested on another charge, and for a time, he and the defendant were in the same pod in the county jail. A month later, the defendant learned that Pritchard was the one who had turned him into the police. A fight ensued, and Pritchard was then moved to another section of the jail.

8

Two issues are intertwined in this question. First we must consider whether the defendant's membership in a gang was admissible,[8] and second, whether the trial court erred in allowing a witness to testify that members of the defendant's gang had come to the courtroom to intimidate him.

Generally, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence." Tenn. R. Evid. 401. The trial court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403. Evidence of a character trait, however, is subject to Rule 404 which provides that evidence concerning a person's character is not admissible except under very limited circumstances, none of which are applicable in this case. Tenn. R. Evid. 404(a). Evidence of other crimes, wrongs, or acts is also subject to Rule 404 and is also generally inadmissible. Such evidence may be admitted only after a hearing is held outside the jury's presence and the trial court determines that the proffered evidence is relevant to some material issue and is not presented only to prove that the defendant acted in conformity with his previous actions. Tenn. R. Evid. 404(b)(1) -(2). The trial court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b)(3).

Testimony or other evidence of a defendant's affiliation with a street gang has been admitted into evidence in Tennessee if the evidence meets the standards in Rules 401, 403, and 404. See, e.g., State v. Johnson, 743 S.W.2d 154, 158 (Tenn. 1987) (defendant's membership in motorcycle gang offered to explain witness's fear of the defendant); State v. Rearno Vaughn, No. 01C01-9703-CR-00086, slip op. at 5-6 (Tenn. Crim. App., Nashville, Apr. 14, 1998) (murder arose out of competition between gangs); State v. Amos Lewis Jones, No. 03C01-

---

[8] The defendant did not deny that he was a gang member during his testimony.

9

9701-CR-00016, slip op. at 3 (Tenn. Crim. App., Knoxville, Feb. 25, 1998) (crimes committed to demonstrate defendant's prowess to criminal gang), perm. app. granted (Tenn. 1998); State v. Bryant Dewayne Millen, No. 02C01-9602-CR-00049, slip op. at 3-4 (Tenn. Crim. App., Jackson, Mar. 7, 1997) (victim was a member of a rival gang); State v, Erica Nelms, No. 02C01-9604-CR-00116, slip op. at 2-3 (Tenn. Crim. App., Jackson, May 23, 1997) (crime committed to win favor with gang); State v. Jack Jay North, Jr., No. 02C01-9512-00369, slip op. at 16 (Tenn. Crim. App., Jackson, Dec. 9, 1996) (defendant's aspiration to become gang member provides motive for first degree murder). Evidence of gang membership is clearly inadmissible if its only purpose is to establish that the defendant acted in conformity with his bad character or to demonstrate that he had a propensity to commit a crime. Bunch v. State, 605 S.W.2d 227, 230 (Tenn. 1980); Tenn. R. Evid. 404.

The fact that the defendant was a member of the Gangster Disciples is irrelevant to any material fact at issue in this case. The circumstances in this case are not similar to those in Nelms in which the jury also found the defendant guilty of felony murder and especially aggravated robbery. In Nelms, gang colors were left at the scene of the crime and several witnesses testified that the defendant committed the crime to win favor with the gang. Erica Nelms, slip op. at 2-3. Nor was the murder the result of gang rivalries as was the case in State v. Rearno Vaughn, No. 01C01-9703-CR-00086, slip op. at 5-6 (Tenn. Crim. App., Nashville, Apr. 14, 1998). See also State v. Bryant Dewayne Millen, No. 02C01-9602-CR-00049, slip op. at 3-4 (Tenn. Crim. App., Jackson, Mar. 7, 1997). Unlike the witness in Johnson, Al Pritchard did not testify that he was afraid of the defendant. Johnson, 743 S.W.2d at 158. Nothing in the circumstances of the crime indicates that the defendant's aborted robbery was related to any gang activities or that he committed the crime to gain membership or status in the gang. Indeed, the record demonstrates that he accepted the invitation to go "shopping" because he wanted the fifteen hundred dollars that he believed the rims would bring. On these facts,

10

his membership in the Gangster Disciples was not relevant to show identity, intent, motive, or common scheme or plan, see State v. Parton, 694 S.W.2d 299, 302-303 (Tenn. 1985), or to sustain the state's burden of proving each element of the crimes beyond a reasonable doubt. See Tenn. Code Ann. §§ 39-12-101, 39-13-403 (1997) and § 39-13-202(a)(2) (1991) (amended 1995).

The defendant's gang affiliation was relevant only to Pritchard's testimony concerning the presence of three alleged gang members in the courtroom. However, this testimony should have been excluded. Pritchard testified that the defendant had asked him to say that he didn't remember what had happened. He also testified that although he had heard some "little remarks" or threats, he did not say that the defendant had threatened him. In fact, Pritchard stated that he was not afraid of the defendant and that he had spoken with him several times after their fight. Nothing in the record indicates that the defendant was in any way responsible for the presence of the three men identified as Gangster Disciples. Nothing indicates that their conduct was inappropriate or threatening. Pritchard testified at length and answered the prosecutor's questions in a forthright manner and without hesitation. His responses were very damaging to the defendant. He explained that his initial hesitation in talking to the prosecutor was the result of his reluctance to speak to a representative of the state without his attorney present.

A defendant does not control who does and who does not enter the courtroom. Unless some evidence exists to demonstrate that the defendant is responsible for the presence of a disruptive element, he surely cannot be held accountable for it.[9] Without some evidence that the defendant was a party to the

---

[9] The trial judge was aware of the presence of the young men even before the prosecutor brought them to his attention. He asked the deputies to search them and to monitor carefully any one who entered the courtroom. Out of the jury's presence, he warned the spectators about the potential problem and described the additional security measures he had taken. These were reasonable steps to ensure the safety of everyone concerned.

alleged intimidation, Pritchard's testimony about "Shaun, Gerald, and Rudy" did not have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401.

Pritchard's testimony about the defendant's gang affiliation and the presence of the alleged gang members in the courtroom should have been excluded. In his brief, the defendant contends that the harmless error rule should not apply in this instance. He has, however, cited no authority for his proposition that the testimony deprived him of a fundamental constitutional right and, therefore, the error demands an automatic reversal of the defendant's conviction. Moreover, pursuant to Tennessee Rule of Evidence 103(a), the admission or exclusion of evidence is not a basis for error unless the ruling affects a substantial right of the party. We find that even if the trial court did err in allowing this testimony to be introduced, no substantial right of the appellant was affected. In light of the defendant's statement to the police and his testimony from the stand, any error in the admission of this testimony was harmless. See State v. Shelley, 628 S.W.2d 436, 438 (Tenn. Crim. App. 1981); Tenn. R. App. P. 36(b).

## IV. Autopsy Photographs

During the guilt phase, the trial court allowed the state to introduce into evidence five photographs of the victim's body taken during the autopsy. The state requested that eight photographs be admitted. After a jury-out hearing, the trial judge ruled that the prejudicial effect of three of the pictures substantially outweighed their probative value. The five remaining photographs, however, the trial judge ruled were relevant and admissible. Exhibit 38 shows the victim's face and naked upper torso peppered with wounds caused by shotgun pellets. Number 39 shows the victim's left arm and a portion of his naked body. Two fingers of the left hand are missing and pieces of shredded flesh are clinging to the bone. Exhibit 40 is a side view of the victim's face and upper torso. The remaining exhibits,

12

numbers 41 and 42, show the left and right side of the body. The photographs, in addition to showing the horrendous number of pellet wounds the victim sustained, include drainage tubes, incisions, and other signs of medical and autopsy procedures.

In this appeal, the defendant argues that the photographs are grisly, inflammatory and of little probative value. The state contends that the photographs were necessary to show the nature and extent of the injuries the victim suffered. The trial court found that the photographs were relevant to show that a death occurred and the various wounds the victim suffered, to illustrate the testimony of the medical examiner, and to demonstrate the direction of the pellets. Although it is a close question in this case, we conclude that the trial court did not abuse its discretion in admitting the photographs.

To be admissible, a photograph must be relevant to some issue at trial, and the prejudicial effect of the photograph must not outweigh its prejudicial value. State v. Bush, 942 S.W.2d 489, 514 (Tenn. 1997); State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). The admissibility of photographs is within the sound discretion of the trial court and the court's determination will not be overturned on appeal except upon a clear showing of abuse of discretion. Bush, 942 S.W.2d at 514; State v. Bordis, 905 S.W.2d 214, 226 (Tenn. Crim. App. 1995).

As a general rule, where medical testimony adequately describes the degree or extent of the injury, gruesome and graphic photographs should not be admitted. State v. Jennifer Collins, No. 03C01-9704-CR-00143, slip op. at 15 (Tenn. Crim. App., Knoxville, Mar. 3, 1998) (citing State v. Duncan, 698 S.W.2d 63 (Tenn. 1985)), perm. app. denied (Tenn. 1998); State v. Cynthia Roberson, No. 02C01-9503-CC-00059, slip op. at 14 (Tenn. Crim. App., Jackson, Dec. 28, 1995). This court has noted an increasing concern that courts may become too liberal in their admission of inflammatory autopsy photographs. Collins, slip op. at 15-16.

13

Photographs made during or after an autopsy should be scrutinized and examined prior to being shown to the jury. State v. James Dubose, No. 01C01-9405-CC-00160, slip op. at 20 (Tenn. Crim. App., Nashville, Aug. 25, 1995), aff'd on other grounds, 953 S.W.2d 649 (Tenn. 1997).

In State v. Banks, the supreme court recognized "the inherently prejudicial character of photographic depictions of a murder victim. . . ." 564 S.W.2d at 951. The court suggested a variety of factors for consideration by the trial judge including the "value of photographs as evidence, . . . their accuracy and clarity, . . . whether they were taken before the corpse was moved . . . [and] the inadequacy of the testimonial evidence in relating the factors to the jury." Id. Moreover, photographs that are unfairly prejudicial must be excluded. Banks, 564 S.W.2d at 951 (quoting Advisory Committee Note to Federal Rule of Evidence 403). Evidence that is unfairly prejudicial has been defined as that "which only appeals to sympathies, conveys a sense of horror, or engenders an instinct to punish. . . " Collins, slip op. at 13 (citing to J. Weinstein and M. Burger, Weinstein's Evidence Manual 6-20 to 6-21 (Student ed. 1987)).

The photographs in this instance are grisly. The victim is lying naked on the slab in the morgue. Pools of blood that may or may not be attributable to the autopsy process have formed behind his head. However, the pictures illustrate the various wounds that led to the victim's death. The photograph of the victim's left hand was relevant to the question of whether the victim could have held his revolver when he got out of the car.[10] Using the photographs, the medical examiner described for the jury the path and trajectory the pellets followed.

Photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used.

---

[10] A police officer testified that he found pieces of flesh clinging to the window sill of the door on the driver's side. A photograph of those pieces was also admitted into evidence.

14

Collins v. State, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973); see also State v. Terrence L. Davis, No. 02C01-95112-CR-00343, slip op. at 14 (Tenn. Crim. App., Jackson, June 2, 1997), perm. app. denied (Tenn. 1998). Photographs must be relevant to prove some part of the prosecution's case and must not be admitted solely to inflame the jury and prejudice them against the defendant. Banks, 564 S.W.2d at 951. Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of "bias, sympathy, hatred, contempt, retribution, or horror." M. Graham, Handbook of Federal Evidence 182-83 (2d ed. 1986).

The trial court found that the photographs in question were probative and that their prejudicial effect did not outweigh their prejudicial value. The photographs are unquestionably unpleasant, but their primary purpose was not to elicit the jurors' emotions but to develop facts that were relevant to proving the state's case. Absent a clear showing that the trial court abused its discretion, this court may not overturn its ruling. No such showing exists in this case, and we will not disturb the trial court's ruling on appeal.

## IV. Excessive Sentence

The jury sentenced the defendant to life imprisonment with the possibility of parole for the murder of Barry Brodey. At the conclusion of a sentencing hearing, the trial court sentenced the defendant to the maximum Range I sentence of twelve years and ordered him to serve the sentence consecutively to the life sentence imposed by the jury. The defendant now complains that the twelve-year sentence is excessive and that the trial court erred in ordering that his sentences be served consecutively.

When an accused challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code

15

Ann. § 40-35-401(d) (1997). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider all the evidence, the presentence report, the sentencing principles, the enhancing and mitigating factors, counsels' arguments, the appellant's statements, the nature and character of the offense, and the appellant's potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -210(b) (1997); State v. Ashby, 823 S.W.2d at 169. The defendant has the burden of demonstrating that the sentence is improper. Id. In the event the record fails to demonstrate the appropriate consideration by the trial court, appellate review of the sentence is purely de novo. Id. If our review reflects that the trial court properly considered all relevant factors and the record adequately supports its findings of fact, this court must affirm the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the sentencing range, the specific sentence, and the propriety of imposing a sentence involving an alternative to total confinement. The trial court must consider (1) any evidence presented at trial and the sentencing hearing, (2) the presentence report, (3) the sentencing principles. (4) the arguments of counsel, (5) any statements the defendant has made to the court, (6) the nature and characteristics of the offense, (7) any mitigating and enhancement factors, and (8) the defendant's amenability to rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), and 40-35-210(a), (b) (1990); State v. Holland, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993). In this case, the trial court was required to begin with a presumptive minimum sentence. Tenn. Code Ann. § 40-35-210(c). The sentence may then be increased by any applicable enhancement factors and reduced in the light of any applicable mitigating factors. Tenn. Code Ann. § 40-35-210(d),(e).

In this case, the trial judge found several enhancement factors and one mitigating factor. However, the record does not contain an affirmative showing that the trial court considered the sentencing principles and all relevant facts and circumstances and made the appropriate findings in determining that consecutive sentences were appropriate. Therefore we review the sentencing determinations without the presumption of correctness. State v. Ashby, 823 S.W.2d at 169.

Especially aggravated robbery is a Class B felony. For a Class B felony, the minimum sentence for a Range I offender is eight years; the maximum sentence is twelve years. Tenn. Code Ann. § 40-35-112(a)(2) (1997). The trial court applied the following factors to enhance the defendant's sentence to the maximum sentence in the range:

(1)     The defendant has a previous history of criminal convictions or criminal behavior. Tenn. Code Ann. § 40-35-114(1).

(2)     The defendant was a leader in the commission of an offense. Tenn. Code Ann. § 40-35-114(2).

(5)     The defendant treated or allowed a victim to be treated with exceptional cruelty. Tenn. Code Ann. § 40-35-114(5).

(6)     The personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great. Tenn. Code Ann. § 40-35-114(6).

(8)     The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community. Tenn. Code Ann. § 40-35-114(8).

(9)     The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense. Tenn. Code Ann. § 40-35-114(9).

(10)    The defendant had no hesitation about committing a crime when the risk to human life was high. Tenn. Code Ann. § 40-35-114(10).

(11)   The felony resulted in death or bodily injury or involved the threat of death or bodily injury to another person and the defendant has previously been convicted of a felony that resulted in death or bodily injury. Tenn. Code Ann. § 40-35-114(11).

(12)   During the commission of the felony, the defendant willfully inflicted bodily injury upon another person, or the actions of the defendant resulted in the death of or serious bodily injury to a victim or a person other than the intended victim. Tenn. Code Ann. § 40-35-114(12).

As a mitigating factor, the trial court found that because of the defendant's age he lacked substantial judgment. Tenn. Code Ann. § 40-35-113(6). The trial court, however, gave the mitigator little weight because of the defendant's previous encounters with the criminal justice system and sentenced the defendant to the maximum sentence of twelve years.

## A. Enhancement Factors

The defendant contends that the evidence does not support the trial court's findings with respect to a number of the enhancement factors. He does not challenge the use of factors (1) and (2). Nor could he. The defendant's juvenile record includes several car thefts as well as less serious infractions including aggravated criminal trespass and disorderly conduct.[11] The record indicates that the defendant, who testified that he knew how to drive and evade the police, was a leader in the commission of the offense. He also provided the weapon, approached the target vehicle, and fired the fatal shots. The trial court's findings with respect to factors (1) and (2) are clearly supported by the record.

---

[11]   In his brief, the defendant questions the use of a printout of the Juvenile Court computer screen instead of court orders to show an adjudication of delinquency. Because the defendant did not challenge the use of the printout at the sentencing hearing, this issue is waived. Tenn. R. App. P. 36(a). We note that as of July 1, 1995, only those delinquent acts that would constitute a felony if committed by an adult may be considered to enhance a sentence. This provision applies to sentencing of any defendant committing an offense on or after that date. The defendant committed these offenses on June 17, 1995. Therefore, the trial court could consider all of the offenses listed on the defendant's juvenile record for the purpose of enhancing his sentence. State v. Adams, 864 S.W.2d 31, 34 (Tenn. 1993).

The state concedes that factors (6), (9), and (10) are inappropriate. We agree. The infliction of serious personal injury (factor 6)[12] and the possession of a firearm (factor 9) are elements of especially aggravated robbery and are, therefore, inapplicable to enhance the defendant's sentence. Tenn. Code Ann. § 40-35-114 (1997). Because the offense of especially aggravated robbery necessarily entails a high risk to human life, factor (10) likewise should not have been applied. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995).

In addition, factors (11) and (12) may not be used to enhance this defendant's sentence. Factor (11) applies when death or bodily injury is inflicted upon or threatens another person and the defendant has previously been convicted of a felony that resulted in death or bodily injury. See State v. Makoka, 885 S.W.2d 366, 373 (Tenn. Crim. App. 1994); Tenn. Code Ann. § 40-35-114(11) (1997). Factor (12) is similar in that it refers to the willful infliction of bodily injury on a person other than the intended victim. The defendant's actions neither threatened nor inflicted bodily injury on any person other than the victim, nor had he been previously convicted of a felony that resulted in death or bodily injury. The trial court erred in using these factors to enhance the defendant's sentence for especially aggravated robbery.

Factors (5) and (8) must be discussed in greater detail. The trial court found that the defendant treated the victim with exceptional cruelty when he shot him five times with a pump-action shotgun. See Tenn. Code Ann. § 40-35-114(5). The defendant argues that the trial court should not have applied the factor because the defendant had already been convicted of felony murder on those same facts. The defendant cites no authority for the proposition that facts used to convict a defendant of one offense may not be used to enhance the sentence for a different

_____

12    This court has previously held that "serious bodily injury" is, in essence, the same as a "particularly great" personal injury. State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995); State v. Jones, 883 S.W.2d 597, 602 (Tenn. 1994); State v. Crowe, 914 S.W.2d 933, 940 (Tenn. Crim. App. 1995).

offense. Therefore, the issue as stated is waived. Tenn. Crim. Ct. App. 10(a). However, under our mandate to review sentences de novo, we consider whether the record supports the use of factor (5) to enhance the defendant's sentence for especially aggravated robbery.

Section 40-35-114 provides that enhancement factors must be "appropriate for the offense" and "not themselves essential elements of the offense." Tenn. Code Ann. § 40-35-114. Because of these limitations, those factors based on facts which are used to prove the offense or which establish the elements of the offense are excluded. State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997) (citing State v. Jones, 883 S.W.2d 597, 603 (Tenn. 1994)). The purpose of the limitation is to avoid enhancing the length of sentences based on factors that the legislature considered when establishing the range of punishment for the offense. Id.

Exceptional cruelty is not an element of especially aggravated robbery. Poole, 945 S.W.2d at 98; Tenn. Code Ann. § 39-13-403(a)(2) (1997). Both our supreme court and this court have held that proof of serious injury does not necessarily establish extreme cruelty. Poole, 945 S.W.2d at 98; State v. John Dennis Rushing, No. 02C01-9501-CR-0020, slip op. at 20 (Tenn. Crim. App., Jackson, July 22, 1996); see also State v. Henry Lee Martin, No. 01C01-9411-CR-00397, slip op. at 23 (Tenn. Crim. App., Nashville, May 24, 1996). A certain amount of cruelty is inherent in every especially aggravated robbery, rape, or aggravated assault for which the legislature has already provided enhanced sentences. State v. Kenneth Alan Steele, No. 03C01-9207-CR-233, slip op. at 15 (Tenn. Crim. App., Knoxville, Oct. 13, 1993). Therefore, factor (5) requires a strong showing of exceptional cruelty. John Dennis Rushing, slip op. at 20.

To establish exceptional cruelty, the facts must demonstrate a culpability distinct from and greater than that incident to the offense of especially

20

aggravated robbery. Poole, 945 S.W.2d at 98. A trial court should state for the record what actions of the defendant, apart from the elements of the offense, constituted exceptional cruelty. State v. Goodwin, 909 S.W.2d 35, 45 (Tenn. Crim. App. 1995).

In this case, the trial court stated that exceptional cruelty was demonstrated by the fact that the defendant shot the victim five times with a pump-action shotgun. The use of a firearm and proof of serious bodily injury are, of course, elements of especially aggravated robbery. Tenn. Code Ann. § 39-13-403 (1997). The facts in the record indicate that the defendant fired five shots. The medical examiner testified that at least three of the shots struck the victim. The fact that the rear and rear side windows of the Cadillac were demolished tends to corroborate the defendant's assertion that two of the shots were fired at the vehicle.[13] The victim apparently ran and placed another vehicle between himself and the defendant. Ms. Blanchard testified that she saw the defendant fire twice at the ground.

The fact that repeated shots were fired do not, of themselves, constitute exceptional cruelty. See e.g. State v. James R. Hankins, No. 02C01-9603-CR-00098 (Tenn. Crim. App., Jackson, May 23, 1997) (shooting victims in neck and in the back does not constitute exceptional cruelty in conviction for especially aggravated robbery). In this case, however, the two shots fired after the victim abandoned the vehicle and attempted to hide himself from the defendant and when he was no longer armed constitute acts unnecessary to commit the crime of attempted especially aggravated robbery. The final shots fired by the defendant demonstrate a culpability distinct from and appreciably greater than that incident to the offense. Although we do not accord this factor the weight we place on factors

---

[13]     Of course, some of the pellets from these shots may have struck the victim as well. The medical examiner testified that although he could identify only three distinct blasts from the medical evidence, more shots could have been fired.

21

(1) and (2), the trial judge did not err in applying factor (5) to enhance this defendant's sentence.

The defense also contends that factor (5) is inapplicable because the jury failed to find that "the murder was especially heinous, atrocious, or cruel" pursuant to Tennessee Code Annotated section 39-13-204(I)(5). We disagree. The aggravating factor found in section 39-13-204 is not identical to the enhancement factor contained in section 40-35-114. The aggravating factor requires a jury to find beyond a reasonable doubt that "the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(1)(5)(1997). The aggravator applies only to convictions for first-degree murder, and the facts must demonstrate that the crime involved torture or serious physical abuse beyond that necessary to kill the victim. The enhancement factor, on the other hand, requires only that the cruelty exceed that which was necessary to effectuate the crime. State v. Lester Bennett, No. 03C01-9403-CR-00104, slip op. at 7 (Tenn. Crim. App., Knoxville, Dec. 8, 1994). The jury's determination on the aggravating factor in the felony murder sentencing does not preclude the trial court from applying factor (5) to a conviction for a different crime. The facts in this case indicate that the defendant's culpability exceeds that required to convict the defendant of the offense in question. The evidence in the record does not preponderate against the trial court's finding.

The trial court also found that the defendant had a previous history of unwillingness to comply with the conditions of release into the community. Tenn. Code Ann. § 40-35-114(8) (1997). The defendant argues that the record contains no evidence that the defendant was placed on probation and that there is no order or copy of an order finding the defendant in violation of probation. The defendant is correct that the record contains no evidence that a court found the defendant in violation of probation. The presentence report, however, states that on April 8,

22

1994, the juvenile court placed the defendant on supervised probation for driving without a driver's license, reckless driving, and being a runaway. On June 1, 1994, the defendant was back in juvenile court on the charge of theft of a vehicle. The matter was adjusted non-judicially, and he was released in the custody of his grandmother. The record shows that on that very same day, he stole another vehicle and was in possession of marijuana. Six weeks later, he was charged with the theft of yet another vehicle. On July 21, 1994, the court placed him under the supervision of the Youth Services Bureau.

Tennessee Code Annotated section 40-35-114(8) does not require that the defendant violate an order of probation. To enhance a defendant's sentence, the state must prove that "[t]he defendant has <u>a previous history of unwillingness to comply with the conditions of a sentence involving release into the community</u> . . . ." Tenn. Code Ann. § 40-35-114(8) (1997) (emphasis added). The defendant's juvenile record indicates that within a three-month period, he was placed on supervised probation, counseled and continued on supervised probation, and then, after he continued to re-offend, he was remanded to a youth training center. At the sentencing hearing, the defendant made no objections to the presentence report, nor did he assert that the report was inaccurate. Nothing in the record indicates that the defendant attempted to have the state substantiate the information in his juvenile record with copies of the judgments or orders. Absent a challenge to the reliability of the information in the report, the trial court did not err in considering the information the report provided. <u>State v. Dale Nolan</u>, No. 01C01-9511-CC-00387, slip op. at 31 (Tenn. Crim. App., Nashville, June 26, 1997), <u>perm. app. denied</u> (Tenn. 1998); <u>State v. Richard J. Crossman</u>, No. 01C01-9311-CR-00394, slip op. at 11 (Tenn. Crim. App., Nashville, Oct. 6, 1994), <u>perm. app. denied</u> (Tenn. 1995). Although the record contains no official finding that the defendant violated a condition of probation, the presentence report demonstrates that this defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release into the community.

## B.  Mitigating Factors

The trial court found, as a mitigating factor, that because of his youth, the defendant lacked substantial judgment in committing the offense.  Tenn. Code Ann. § 40-35-113(6) (1997).  The trial judge declined to place much weight on this factor because of the defendant's previous experiences with the criminal justice system.  Our review of the record has convinced us that the mitigating factors present are entitled to substantial weight.  According to the defendant's school records, he has a vision disorder that interferes with his ability to read and function in an academic setting.[14]  At age thirteen, he read at the second grade level although his math skills were those of a fifth grader.  At the sentencing hearing, the defendant's grandmother testified that when the defendant was born, his mother was an exotic dancer who worked nights and his father was "on the streets." Because she needed to sleep during the day, the defendant's mother beat him and burned him with cigarettes when he would not be quiet.  When he was two years old, he was placed in the custody of his paternal grandparents.  At the time of the sentencing hearing, the defendant's father was in jail.  His grandfather had died after a long and difficult bout with cancer.  His grandmother admitted that during the past few years she had little energy or time to spare for her difficult grandson.  The defendant had maintained a relationship with his mother, but she made little effort to provide guidance or supervision.  In fact, the defendant was spending the night at her house when Tyre Allen came to take him on the "shopping" trip that ended in Barry Brodey's death.

In the closing paragraph of the defense brief, counsel argues that the defendant "may have developed street survivorship skills due to parental neglect and actual or perceived necessity.  But to say that he is street 'wise' would be a misnomer.  He has not had enough time on this earth or adult guidance to develop any wisdom or substantial judgment." We agree.  The defendant was just fifteen

---

[14]     This disorder is referred to as "accommodative spasm" which is related to focusing and affects visual perception.

24

years old when this crime was committed.  He suffered from abuse and neglect during his childhood, and he is further handicapped by a vision problem that led to failure at school.  He was raised by his grandmother who because of her age and the responsibility for caring for her ailing husband was unable to provide her troubled grandson with the supervision and guidance he needed.  On these facts, the mitigating factor is due considerable weight.

To sum up, we find that enhancement factors (1), (2), (5), and (7) are applicable to the defendant's sentence.  We place less weight on factor (5); however, the extent of the defendant's criminal record and his inability to conform to the rules of a civilized society are entitled to great weight.  Attempted especially aggravated robbery is a class B felony.  The defendant's applicable sentencing range is eight to twelve years.  Tenn. Code Ann. § 40-35- 210 (1997).  Based solely on the enhancement factors, twelve years would be an appropriate sentence.  However, in this case, the mitigating factor is also entitled to great weight.  Therefore we reduce the defendant's sentence for attempted especially aggravated robbery to ten years.

## C. Consecutive Sentences

The defendant protests the trial court's order that he serve the sentence for attempted especially aggravated robbery consecutively to the life sentence imposed by the jury. Consecutive sentencing may be imposed in the discretion of the trial court upon determination that one or more of the criteria listed in Tennessee Code Annotated section 40-35-115(b) exist.   Consecutive sentences however, should not be routinely imposed even for the offender whose record of criminal activity is extensive.  Tenn. Code Ann. § 40-35-115, Sentencing Comm'n Comments; State v. Taylor, 739 S.W.2d 227, 230 (Tenn. Crim. App. 1987); State v. David L. Mayes, No. 03C01-9610-CR-00365 (Tenn. Crim. App., Knoxville, Sept. 9, 1997); State v. Roscoe C. Smith, No. 01C01-9502-CR-0003, slip op. at 10 (Tenn. Crim. App., Nashville, Oct. 12, 1995). Moreover, the consecutive sentencing factors

25

"cannot be read in isolation from other provisions of the Sentencing Reform Act of 1989." State v. Wilkerson, 905 S.W.2d 933, 937 (Tenn. 1995).

The trial court, in this instance, made no findings pertaining to consecutive sentencing and did not indicate on which of the consecutive sentencing criteria he relied. However, based upon our de novo review, we find that this defendant is a dangerous offender. As defined in Tennessee Code Annotated section 40-35-115(b)(4), a dangerous offender is one "whose behavior indicates little or no regard for human life, and no hesitation about committing a crime when the risk to human life is high." The defendant, who was armed with a loaded sawed-off shotgun, ordered the victim out of his car in an attempt to steal the vehicle's popular and expensive rims. When the victim refused to comply and threatened the defendant, the defendant shot the victim at close range rather than abandon the attempt. Moreover, he did not stop with one blast of the shotgun. He fired five times and at least three of those shots hit the victim. The defendant had previously participated in similar car-jackings. Such behavior indicates a serious disregard for human life and no hesitation about risking the loss of human life in exchange for a relatively small amount of money.

A court, however, may not impose consecutive sentences on the weight of these two findings alone. In State v. Wilkerson, our supreme court referred to two additional requirements that must be satisfied before consecutive sentences may be imposed on a dangerous offender. The court must find that consecutive sentences (1) are reasonably related to the severity of the conduct and (2) are necessary to protect the public from further criminal conduct. Wilkerson, 905 S.W.2d at 937-38. We find that the two Wilkerson requirements are satisfied in this instance.

Barry Brodey died as result of the defendant's determined attempt to steal a set of rims. A consecutive sentence is reasonably related to the severity of

the offense in this case, and the defendant does not contend otherwise. The defendant does contend that consecutive sentences are not necessary to protect the public. He argues that he will have to serve more than fifty years on the life sentence before he is eligible for parole, and that a consecutive sentence will do nothing further to protect society. This crime, however, was committed on June 17, 1995. At that time, Tennessee law provided that those serving life sentences were eligible for parole after a minimum of twenty-five calendar years. Tenn. Code Ann. § 40-35-501(h)(1) (1991).[15] Under the law applicable at the time the offense was committed, the defendant will be eligible for parole for his life sentence when he is approximately 40 years old.

The defendant's actions betray a lack of respect for society's laws, a warped sense of values, and a hardness of heart that are frightening in one so young. His prospects for immediate rehabilitation are not good. This young man has had little opportunity to develop the kind of attitudes and skills that would have allowed a little boy to become a thoughtful, productive man. Barry Brodey's life has been destroyed and the defendant's life wasted. All of society is diminished by this loss. Nevertheless, the public needs to be protected from those who cannot or will not abide by the rules of civilized society. The trial court did not err in imposing consecutive sentences in this case.

## Conclusion

We have reviewed the record before us and have found no error warranting the reversal of the defendant's convictions. For the reasons discussed

---

[15] In 1995, the legislature added subsection (I)(1) to Tennessee Code Annotated section 40-35-501 which provides that there shall be no release eligibility for a person convicted of various crimes including first degree murder except for a possible reduction of no more that fifteen percent of the sentence for earned and retained sentence credits. Tenn. Code Ann. § 40-35-501(I)(1) (1997). The new statute specifically states that its provisions apply to those persons who commit offenses "on or after July 1, 1995." Id. (emphasis added). The defendant murdered Mr. Brodey on June 17, 1995, and the new release eligibility formula does not apply to him.

above, we modify his sentence for attempted especially aggravated robbery to ten years. This sentence will be served consecutively to his life sentence.

We must address an additional matter which we discovered during our review of the record. The jury in this case found the defendant guilty of felony murder but did not return a verdict on the first count of the indictment. The record does not reflect that the trial court dismissed this count.

The defendant's convictions and life sentence are affirmed. His sentence for especially aggravated robbery is reduced from twelve years to ten years. The defendant will serve the ten-year sentence consecutively to the life sentence. The second count of Indictment # 96-00973 in which the defendant was charged with premeditated and deliberate murder is dismissed.

_____
JAMES CURWOOD WITT JR., Judge

CONCUR:


_____
JOE G. RILEY, Judge


_____
ROBERT W. WEDEMEYER, Special Judge

28